IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON | : : : : : | |
| v. | : | Civil No. CCB-11-1809 |
| R.J. WILSON & ASSOCIATES, LTD. ET AL. | : : : : : | |

## MEMORANDUM

The plaintiff in this case, Certain Underwriters at Lloyd's, London ("Underwriters"), has brought suit for breach of contract, breach of fiduciary duty, fraud, and unjust enrichment against two business partners in the United States, R.J. Wilson & Associates ("R.J. Wilson") and Medical Benefits Administrators of MD, Inc. ("MBA"). Defendants have filed an answer. Now pending are defendants' motions for leave to file a third-party complaint, (ECF No. 25), and for leave to file an amended answer. (ECF No. 37.) Underwriters has filed a motion to strike affirmative defenses in defendants' answer. (ECF No. 40.) The pending motions have been fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the following reasons, the defendants' motions will be granted and Underwriters's motion will be denied without prejudice.

### I. BACKGROUND

This dispute concerns the "Client First" insurance program through which Underwriters provided excess loss coverage to certain employer self-funded benefit plans in the United States.

1

(Compl. ¶ 4, ECF No. 1.)  On March 3, 2005, Underwriters entered into a contract (the "Client First Binding Authority") with R.J. Wilson, a Maryland company, to provide for the administration of the program.  (*See* Client First Binding Authority, ECF No. 1, Ex. B.)  The contract authorized R.J. Wilson to function as an insurance agent or "coverholder" for the program and identified MBA as the claims administrator for the program.[1]

In a separate agreement or agreements, the parties also contracted for similar services with regard to a set of *multi*-employer welfare benefit plans (the "Association Trust program"). (*See* Def.'s Reply Mot. File Third-Party Compl. 5–6, ECF No. 28.)  There are two lawsuits related to the Association Trust program pending at this time, one in Illinois state court and one in the United States District Court for the Northern District of Illinois.  (See Pl.'s Opp. to Def.'s Mot. File Third Party Compl. 4 & n.2, ECF No. 27.)  The parties agree, however, that only the Client First program is the subject of the lawsuit at issue here.

According to Underwriters, the Client First program entailed efforts by an entity called Client First Brokerage, Inc. to market single-employer, self-funded employee benefit plans "on behalf of MBA under the name Client First Health Plans."  (Compl. ¶ 13.)  R.J. Wilson had the authority to bind and administer certificates of insurance ("certificates") for the program on behalf of Underwriters.  (*Id*. at ¶ 18.)  In describing the parties' responsibilities under the Client First program, defendants state that MBA was "responsible for deciding which claims submitted by the individual employee benefit plans to pay, while R.J. Wilson, as coverholder, was responsible for actually paying those claims."  (Def.'s Reply Mot. File Third-Party Compl. 5.)

The Client First program included a mechanism through which Underwriters would

---

[1] R.J. Wilson and MBA are related companies.  R.J. Wilson is owned, at least in part, by Mr. Ronald Wilson and a Wilson family trust, of which Mr. Wilson is the trustee.  Fifty percent of MBA is owned by a company called Wilson-Bennet, LLC, of which Mr. Wilson owns eighty percent.

provide the insured benefit plans with an advancement of funds once claims reached a certain level. The insureds would then repay Underwriters to the extent that the funds were not needed to pay out covered claims in excess of the plan deductibles. (Compl. ¶¶ 21–24). The terms of this mechanism were stated in an amendment to each certificate of insurance, denominated the Monthly Aggregate Accommodation ("MAA") agreement. (*See* ECF No. 1, Ex. C.) Underwriters allege that R.J. Wilson was in charge of administering the advancements and recouping the repayments under the MAA mechanism and was required to submit monthly "bordereaux" reports to Underwriters detailing the claims, advancements, and repayments. (Compl. ¶ 28.)

According to the complaint, R.J. Wilson's June 2008 bordereaux report "revealed more than a million dollars in accommodation advances that had never been repaid to Underwriters." (*Id.* at ¶ 30.) As a result, Underwriters allege, they "employed Northshore International Insurance Services, Inc. ("NiiS") to conduct a reconciliation review of aggregate accommodation advances and credits related to the Client First Certificates." (*Id.* at ¶ 31.) Underwriters allege that NiiS's audit "was hampered by R.J. Wilson and MBA's failure to maintain records as required by the Certificates." (*Id.* at ¶36.) Allegedly, nearly half the files associated with the monthly reports were "discovered to be missing." (*Id.*) Underwriters therefore could only rely on the numbers reported by R.J. Wilson in the June 2008 report and as a result issued a demand for repayment of $1,035,450.34 in overpayment accommodations. (*Id.* at ¶ 42.) R.J. Wilson responded to Underwriters by asserting that, based on its own calculations, Underwriters owed R.J. Wilson $236,969.05. (*Id.* at ¶ 43.)

On June 30, 2011, Underwriters filed the complaint in the instant action, alleging counts

3

of breach of contract against R.J. Wilson (Count I), breach of contract against MBA (Count II), breach of fiduciary duty against R.J. Wilson and MBA (Count III), fraud against R.J. Wilson (Count IV), and unjust enrichment against R.J. Wilson and MBA (Count V). (ECF No. 1.) The complaint was largely based on the discrepancy in the June 2008 report and the irregularities during the audit process, but it also included Underwriters's allegation that in July 2009, R.J. Wilson submitted three claims for reimbursement that were duplicative of claims that had previously been reimbursed. (Compl. ¶ 41.)

On August 29, 2011, defendants filed an answer uniformly denying the allegations in the complaint. The answer sets forth twenty "additional defenses." The defenses listed include specific defenses such as "unlawful anticipatory breach of contract" and general defenses such as the statement that defendants "generally deny all liability and damages." The final two defenses listed are statements reserving the right to amend the answer to incorporate defenses that become apparent as the case progresses. (Def.'s Answer 9–11, ECF No. 6.)[2]

On December 30, 2011, defendants then filed a motion for leave to file a third-party complaint against NiiS. (ECF No. 25). The motion alleges that NiiS "wrongfully interfered with and improperly interrupted the subject insurance contracts, claims processes, and business practices for its own pecuniary gain" and therefore that NiiS should be liable for any damages caused to Underwriters. (Def.'s Mot. File Third-Party Compl. ¶ 7, ECF No. 25.)

According to the proposed third-party complaint, defendants questioned the

---

[2] Stated briefly, the listed defenses were: (1) failure to state a claim, (2) recovery barred by statute of limitations, (3) failure of conditions precedent, (4) unlawful anticipatory breach, (5) settlement, (6) release, (7) accord and satisfaction, (8) failure to mitigate damages, (9) general denial of all liability and damages, (10) collateral estoppel and/or res judicata, (11) estoppel, (12) waiver, (13) unclean hands, (14) breach of contract by plaintiff, (15) no compensable damages or losses, (16) barred by plaintiff's fraud and misrepresentation, (17) mutual mistake, (18) lack of authority, capacity, or standing, (19) any other affirmative defenses as may become apparent during course of discovery, and (20) all defenses which may become apparent based on facts as may become known prior to or during trial. (Def.'s Answer 9–11, ECF No. 6.)

independence of NiiS at the time of the alleged audit, and "requested that [Underwriters] retain a truly independent auditor . . . , which Underwriters refused." (Proposed Third-Party Compl. ¶ 17, ECF No. 25-2.) Subsequently, "NiiS was denied further access to Defendants/Third-Party Plaintiffs' records." (*Id.* at ¶ 19.) Defendants claim that NiiS's "tortious and wrongful interference" resulted in damages to the defendants and "to the extent that the Plaintiff has been damaged as alleged . . . , any such damage was caused by NiiS." (*Id.* at ¶ 20.) The proposed third-party complaint contains three counts, for indemnification (Count I), contribution (Count II), and tortious interference with contract (Count III).

On January 17, 2012, Underwriters filed a brief in opposition to the motion. On February 3, 2012, defendants filed a reply brief, though also attaching an amended third-party complaint. (*See* ECF No. 28, Ex. A; ECF No. 29.) On February 9, 2012, Underwriters filed a letter with the court noting the attachment of the amended third party complaint and reiterating its opposition.[3]

On March 14, 2012, defendants filed a motion for leave to amend their answer, including two new affirmative defenses—an "impossibility" defense relevant to the proposed third-party complaint and another general defense denying legal liability. Underwriters filed a response in opposition to the motion and also a separate motion to strike. (ECF Nos. 39 & 40.) In their response and the motion to strike, Underwriters argue that the court should strike the affirmative defenses identified in both the original and proposed amended answer because the defenses fail to meet the pleading standards of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

---

[3] Because Underwriters does not specifically object to the filing of the amended third-party complaint, the court will treat the amended complaint as properly presented to the court for the purpose of this motion.

## II. DISCUSSION

### A. Motion for Leave to File a Third-Party Complaint

Federal Rule of Civil Procedure 14(a)(1) permits a defendant to move to implead a non-party "who is or may be liable to [the defendant] for all or part of the claim against [the defendant]." Fed. R. Civ. P. 14(a)(1). District courts have discretion to grant or deny a motion under Rule 14. *Noland Co. v. Graver Tank & Mfg. Co.*, 301 F.2d 43, 50 (4th Cir. 1962). "Impleader [under Rule 14] will be liberally allowed, if it will prevent duplication of suits based on closely related matters." *Dishong v. Peabody Corp.*, 219 F.R.D. 382, 385 (E.D. Va. 2003) (citing *Noland Co.*, 301 F.2d at 50). However, impleader may be denied where joining the third party "will introduce unrelated issues and unduly complicate the original suit" or "might prejudice the original plaintiff or the third-party defendant." *Id.*

In addition, impleader is proper "only when a right to relief exists under the applicable substantive law." 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1446 (3d ed. 2010). Thus, the court may consider "whether the third-party complaint states a claim upon which relief can be granted." *Too, Inc. v. Kohl's Dept. Stores, Inc.*, 213 F.R.D. 138, 140 (S.D.N.Y. 2003) (citations omitted). *But see Gross v. Hanover Ins. Co.*, 138 F.R.D. 53, 55 (S.D.N.Y. 1991) (noting that "there is some question as to whether plaintiff may attack the merits of the proposed third-party claims at this stage of the proceedings").

Underwriters argues that joining NiiS would introduce unrelated issues and unduly complicate the present suit, delay the case, and prejudice Underwriters's interest in obtaining speedy relief. Underwriters's central contention is that the third-party complaint seeks to address NiiS's actions with regard to the Association Trust program, which is otherwise not at issue in

this case. If this were a possibility, impleading NiiS could be found to significantly complicate the case with what would appear to be an unrelated issue. Defendants, however, have stipulated that their claim of tortious interference against NiiS involves the contracts in the Client First Program, not the Association Trust program. (*See* Def.'s Reply Mot. File Third-Party Compl. 5–6.) The third-party complaint therefore is not likely to introduce unrelated issues to any significant extent.

Underwriters also argues that the tortious interference claim in the proposed third-party complaint would require trial on scienter elements not at issue in Underwriters's original suit. While this may be true, the tortious inference claim would also require evidence of many of the same facts that *will* be at issue in this case. Defendants have signaled their intent to raise NiiS's actions as part of their defense in the original suit. Thus, even if the court does not grant the motion for leave to file a third-party complaint, discovery in the present case would likely address questions regarding the exact nature of NiiS's actions, whether the actions were improper, and whether they caused damages to either defendants or to Underwriters.

Underwriters's reliance on *Dishong* is therefore misplaced. In *Dishong*, the court denied the proposed impleader of a third party because "[t]he issues raised by the third-party complaint [we]re unrelated to those presented in plaintiff's complaint, and *almost all* of the evidence that would be relevant to the third-party claim has no connection to the original claims." *Dishong*, 219 F.R.D. at 386 (emphasis added). Here, the situation is the reverse. Almost all of the evidence that would be relevant to defendants' third-party claim *does* have a connection to the original claims and could be at issue in discovery whether or not this motion is granted. Accordingly, the court does not find that defendants' proposed third-party complaint would

unduly complicate the present suit.

For the same reason, considerations of judicial economy and prejudice also weigh in favor of defendants' motion. As Underwriters argues, discovery for the third-party complaint may overlap with discovery in the ongoing Association Trust litigation. For example, NiiS prepared reports for Underwriters that combined audits of the Association Trust and Client First programs, (Def.'s Reply Mot. File Third-Party Compl. 7), and therefore those reports would be relevant to the Association Trust cases and the third-party complaint. But, as discussed above, the same reports are almost certainly *already* relevant to the Client First litigation at issue here. Thus, whether or not the court grants this motion, discovery in this case may overlap with discovery in the Association Trust cases. The court cannot say, therefore, that granting defendants' leave to file the third-party complaint will prejudice Underwriters one way or another. Rather, to the extent that impleading NiiS here prevents *yet another* lawsuit from being filed, judicial economy will be served and prejudice to Underwriters limited.

Finally, while Underwriters argues that defendants would be barred under Maryland law from bringing actions for indemnity or contribution against NiiS, Underwriters does not argue that the claim for tortious interference would be similarly barred. As a result, at least as to the claim for tortious interference, impleader under these circumstances properly raises a claim under substantive law, will not introduce unrelated issues, will not unduly complicate the original suit, and will not prejudice Underwriters or NiiS. The court need not, therefore, reach the question of whether defendants' claims for indemnification or contribution are properly pleaded. Defendants' motion may be granted on the basis of the claim for tortious interference

alone.[4]

## B. Motion to Strike and Motion for Leave to File an Amended Answer

Defendants have also moved for leave to file an amended answer to add two additional defenses to the eighteen defenses pleaded in their original answer. Underwriters have opposed the motion to amend and moved to strike the original eighteen defenses as well. Underwriters supports both their opposition to the motion to amend and their motion to strike by arguing that the defenses do not meet the pleading standards of *Twombly*, 550 U.S. at 570, and *Iqbal*, 556 U.S. at 662. The Supreme Court has not expressly held that the *Twombly* and *Iqbal* pleading standards apply to the affirmative defenses. And while other judges in this district have held as much, *see Bradshaw v. Hilco Receivables, LLC*, 725 F. Supp. 2d 532, 536 (D. Md. 2010), the Fourth Circuit has not yet ruled on the question.[5]

In the interests of judicial economy, however, the court need not decide here whether *Twombly* and *Iqbal* apply to affirmative defenses. Even if the pleading standards do apply, Underwriters has not demonstrated prejudice in the event that this court denies their motion to strike or grants defendants' motion for leave to amend. And, given the relatively strict standard for a motion to strike and relatively liberal standard for a motion to amend, the court is disinclined to use its discretion to strike or limit defendants' affirmative defenses in the absence of clear and undue prejudice.

---

[4] In so concluding, the court does not hold that each or any of the three counts necessarily states a claim under the pleading standards of Rule 12(b)(6), *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), or *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). NiiS, once served, may still bring a motion to dismiss pursuant to Rule 12. *See* Fed. R. Civ. P. 14(a)(2)(A) (noting person served with a third-party complaint may "assert any defense against the third-party plaintiff's claim under Rule 12").

[5] It is worth noting, as a practical matter, that defendants ordinarily have a much shorter time to determine and plead affirmative defenses in their answer than plaintiffs have to develop the facts that should be pled to support their complaint.

Federal Rule of Civil Procedure 12(f) permits district courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 12(f) motions are generally viewed with disfavor "because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal citations and quotations omitted); *see also Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331, 2012 WL 380107 at *5 (D. Md. Feb. 3, 2012) (finding *Twombly* and *Iqbal* apply, but exercising discretion not to strike defenses where "plaintiffs articulated no prejudice that would result from a denial of their motion"). Underwriters has not demonstrated prejudice would result from the court's denial of the motion to strike.[6]

Furthermore, I cannot conclude defendants' answer contains "impertinent" or "scandalous" matter or otherwise merits this drastic remedy. Rather, many of the defenses in defendants' answer and amended answer state nothing more than the argument that Underwriters fails to make out a prima facie case of breach of contract. This is true, for example, for the defenses of (1) failure to state a claim and (15) no compensable damages or losses. Many other listed defenses are traditional contract law defenses that do not stray far from addressing the prima facie case, and would not significantly affect the scope of discovery. To the extent that any of the remaining defenses will require extensive discovery not otherwise necessary for plaintiff's prima facie case, the court may entertain objections as they arise. Accordingly, I will deny Underwriters' motion to strike, though without prejudice as to reconsideration of whether

---

[6] As defendants note, "when affirmative defenses are stricken, the defendant should normally be granted leave to amend." *Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331 (D. Md. 2012). Thus, to the extent Underwriters are concerned about potential delay, it is not clear that granting a motion to strike would be helpful in that regard—especially given that Underwriters waited seven months after the original answer was filed to move to strike the affirmative defenses contained therein.

any affirmative defenses properly remain in the case at the time of dispositive motions.

Similarly unhelpful to Underwriters, Fourth Circuit case law directs that a motion to amend under Fed. R. Civ. P. 15(a)(2) "should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile." *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008). At this stage in the litigation, the court does not discern any bad faith on the part of defendants, and Underwriters has not argued that it will suffer any undue prejudice if the court allows defendants to file their amended answer. Thus, the motion for leave to amend should be denied only if the additional affirmative defenses are "futile." Again in the interests of judicial economy, I will defer the "futility" analysis until the filing of dispositive motions when all parties have a more thorough understanding of what issues properly remain in the case. Defendants' motion for leave to file an amended answer therefore will be granted.

## **CONCLUSION**

For the above reasons, defendants' motions will be granted and Underwriters' motion will be denied without prejudice. A separate order follows.

|  |  |
|---|---|
| <u>    July 17, 2012    </u><br>Date | <u>             /s/             </u><br>Catherine C. Blake<br>United States District Judge |